IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

CURTIS JOHNSON, )
)
       Plaintiff, )
)
v. ) Case No. 14-CV-29-PJC
)
CAROLYN W. COLVIN, )
Acting Commissioner of the )
Social Security Administration, )
)
       Defendant. )

**OPINION AND ORDER**

Plaintiff, Curtis Johnson ("Johnson"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying Johnson's application for disability insurance benefits pursuant to the Social Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be taken directly to the Tenth Circuit Court of Appeals. Johnson appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Johnson was not disabled. For the reasons discussed below, the Court **AFFIRMS** the Commissioner's decision.

**Claimant's Background**

Johnson was 51 years old at the time of the hearing before the ALJ on January 4, 2012. (R. 50). He had completed tenth grade and had obtained a GED. (R. 57-58).

Johnson had back surgery in May 2008 that was paid for by the Oklahoma Department of Rehabilitation Services ("DRS"). (R. 72). Johnson testified that at the time of the surgery, his

caseworker with DRS had changed, and there was a delay in getting authorization for him to attend rehabilitation physical therapy. *Id.* When his therapy was approved, he attended, and he thought his condition improved some. (R. 73).

Johnson had originally seen his back surgeon, Dr. Milo, in 2006, and then returned in 2008 when the surgery was done. (R. 85-86). He said that the two-year delay was partly due to funding delays by the DRS but also because he tried other treatments, such as seeing a chiropractor, that he had hoped would improve his condition. (R. 86). When his condition did not improve, he was approved by DRS to see Dr. Milo. (R. 86-87).

At the time of the hearing, Johnson walked with a cane and with legs bent due to his condition. (R. 73-74). When he walked into the hearing room, he braced himself by using one hand against the wall. (R. 76). He said that he had used walls, handrails, and other objects to grasp while walking since the 2008 surgery. *Id.* He had been prescribed a cane and a wheelchair. (R. 74). The wheelchair was in storage because he didn't feel that his condition was "down that far yet." *Id.* He had been using the cane since his 2008 surgery. *Id.* He had two walkers that he had sometimes used since the surgery. (R. 81-82). He kept one walker in his car all the time. *Id.* The walkers were sometimes helpful, but he also found them to be inconvenient. (R. 81). His usual practice if he went to a store such as Wal-Mart would be to park as close as possible to one of the store's shopping carts, and then he could use the cart for balance. (R. 82). He had a handicapped parking placard. *Id.*

Johnson testified that his ability to walk after the surgery was "considerably better" than his ability to walk at the time of the hearing. (R. 75). After the surgery, he had progressed to walking two or three blocks, but his conditioned then worsened so that he could walk only one block. (R. 74). He believed he had been in a gradual decline since the improvement immediately

after the surgery. (R. 75-76). He testified that he did not have numbness in his legs and walking was not painful. (R. 77). He had not fallen "in a while," which he believed was because he was very cautious when he walked. (R. 78). His walking was extremely slow. (R. 79). He could only climb stairs if there was a handrail for him to grasp. (R. 78).

Johnson testified that he could not do a "sit down" job because of back pain and because of his difficulty changing positions from standing to sitting. (R. 78). He did not have enough strength in his legs to get to a standing position without using his upper body to assist. (R. 89). To stand up from a sitting position, he needed something to pull himself up. (R. 79, 89). He thought that he could stand for 30 minutes at most, and then he would be exhausted and need to sit down. (R. 83). He would need to rest for an hour or two after standing that long, and he thought he could only stand that long once or twice in a day. *Id.* Standing would also make his back hurt. (R. 84).

Johnson testified that he quit seeing his surgeon, Dr. Milo, in February 2009 because DRS quit paying for those visits, and he did not have money to pay for them. (R. 77). He never returned to work after the surgery, and Dr. Milo never released him to return to work. (R. 76). Johnson testified that the medications he was taking at the time of the hearing caused some nausea and sleepiness. (R. 70).

Johnson saw Charles Gebetsberger, M.D. on March 7, 2005, and it was noted that he had an ataxic gait for 6-8 years with intermittent fleeting paralysis of his extremities. (R. 294-95). He was referred to a neurologist. *Id.*

On August 29, 2005 Johnson saw Dr. Gebetsberger for a complaint of back pain. (R. 292-93). It was noted that his gait was abnormal, with positive straight leg raising bilaterally. (R. 292). He was tender to palpation in the paravertebral muscles of his lumbar spine. *Id.* The

3

physician's assessment was low back pain with sprain or strain. (R. 293). X-rays showed mild degenerative changes. (R. 305).

Emil Milo, M.D., orthopedic surgeon, saw Johnson on February 27, 2006 for an evaluation of his back and leg problems. (R. 333). Dr. Milo said that Johnson had a lengthy 10-15 year history of problems walking exacerbated by an episode in September 2005 causing severe pain in his low back with radiation into his legs. *Id.* At the time Dr. Milo saw Johnson, the pain was reduced, but Johnson had a spastic gait. *Id.* Dr. Milo summarized the results of x-rays and a September 26, 2005 MRI. *Id.* His impressions were ruptured disks at the L2/L3 and L4/L5 levels; bulging disks at three levels; severe degenerative arthritis of the lumbosacral spine; and spastic gait. *Id.* He recommended a myelogram to see the extent of the compression of the spinal cord, which Dr. Milo believed was Johnson's main problem. *Id.*

Johnson saw Dr. Milo again February 4, 2008, and Dr. Milo said that Johnson's clinical findings, including weakness in both legs, were far worse than in 2006. (R. 309). He recommended surgery, including diskectomy. *Id.*

On April 16, 2008, Dr. Milo wrote again regarding Johnson's condition, and he said that he needed additional imaging before being able to proceed with surgery, especially given that Johnson had chiropractic treatment in the two years after the October 2005 MRI. (R. 313). Dr. Milo apparently prescribed a corset, because he noted Johnson's corset size. *Id.*

A myelogram completed April 29, 2008 showed a mild disk bulge at L2/L3. (R. 418).

Dr. Milo did back surgery on Johnson at Henryetta Medical Center on April 30, 2008. (R. 427-28).

Dr. Milo saw Johnson for his first postoperative visit on May 19, 2008. (R. 370). Johnson stated that he was walking three to four blocks a day, which he could not do before the

4

surgery. *Id.* Dr. Milo recommended that he increase his walking or begin swimming. *Id.* On June 16, 2008, Dr. Milo said that Johnson's gait was better, but he preferred "to sit and play with his computer rather than to walk." *Id.* He said that Johnson was a long way from being cured, and he needed to increase his walking from one block to one mile. *Id.* On July 14, 2008, Dr. Milo said that Johnson still had the scissoring gait which was of neurological origin. *Id.* He said that Johnson needed to increase his activities, and that they would try to get authorization from DRS for physical therapy. *Id.*

On August 11, 2008, Dr. Milo noted that Johnson had no physical therapy, and he said that Johnson had approval from DRS. (R. 317). Dr. Milo gave him another prescription for physical therapy "to have it done locally." *Id.*

On September 8, 2008, Dr. Milo wrote that Johnson had no physical therapy and had quit his treadmill, which he had been "strongly urged" to do daily. (R. 314). Dr. Milo recommended that Johnson go to a rehabilitation center for two weeks on an inpatient basis, and he said this request would be made to DRS. *Id.*

DRS correspondence dated September 17, September 22, September 25, and October 16, 2008 indicated that DRS was communicating with the rehabilitation center regarding the physical therapy prescribed by Dr. Milo. (R. 316, 319).

On October 6, 2008, Dr. Milo again noted that Johnson had not been in physical therapy, and he said that Johnson had "totally lost everything, not having therapy after quite an extensive back surgery." (R. 370).

Johnson had an initial evaluation for outpatient physical therapy on October 22, 2008. (R. 323-25). The evaluation noted that Johnson had a severe gait deformity, but it indicated that

he was not using any assistive devices. (R. 323). His physical therapist completed a progress report dated November 14, 2008, indicating that Johnson had attended 10 sessions. (R. 326).

On November 17, 2008, Dr. Milo noted that Johnson had two weeks for physical therapy, and he prescribed another six weeks. (R. 370). He said that Johnson had some improvement. *Id.*

Johnson's physical therapist wrote a note dated December 12, 2008 stating that Johnson had not attended therapy since November 14, 2008 because authorization was not received from DRS until December 9, 2008. (R. 436). He said that Johnson had been working on some exercises at home over the month and was planning to continue physical therapy. *Id.*

On December 15, 2008, Dr. Milo said that Johnson had only one additional session of therapy because of problems between DRS and the rehabilitation center. *Id.* Dr. Milo said that Johnson's gait was slightly better, with not as much scissoring. *Id.* He said that Johnson should increase walking on the treadmill. *Id.*

Notes show that Johnson attended eight sessions of physical therapy in December 2008 and January 2009. (R. 441-45). A discharge form was dated January 7, 2009. (R. 433).

On January 12, 2009, Dr. Milo wrote that Johnson appeared to be gaining strength in both of his legs and to be walking with a slightly less spastic gait. (R. 311). On February 9, 2009, Johnson was able to step on his tiptoes, and Dr. Milo believed he was gradually gaining strength. *Id.* Dr. Milo recommended that Johnson approach DRS regarding having treatment for an inguinal hernia. *Id.* On April 6, 2009, Johnson said that he had not improved much, and Dr. Milo gave him exercises to do on his own. (R. 371). On June 1, 2009, Dr. Milo said that Johnson's situation was in "total limbo" because he was still waiting on repair of his hernia. *Id.* He said that Johnson's best option was to "do whatever he can do." *Id.* On July 27, 2009, Dr.

Milo indicated that he did not expect much further improvement in Johnson's back condition. *Id.*

Johnson had surgery to repair the inguinal hernia on September 9, 2009. (R. 348-49).

Johnson was treated at Utica Park Clinic in 2009 for hypertension. (R. 353-67).

On November 13, 2009, Dr. Milo reviewed the history of his treatment of Johnson's issues, and he said that Johnson still had a spastic scissoring gait. (R. 330). His impressions were chronic low back pain; degenerative arthritis, lumbosacral spine; possible spinal stenosis, multiple levels; and spastic antalgic gait, due to old spinal cord injury. *Id.* He recommended a new MRI to see if there was any new pathology that needed evaluation. *Id.* If not, he recommended intensive physical therapy and rehabilitation. *Id.* On December 16, 2009, Dr. Milo reviewed the findings of the MRI and said that no surgical intervention was needed. (R. 372). He said that it would still be worthwhile to have another course of physical therapy. *Id.* On January 13, 2010, Dr. Milo said nothing had been done, and he urged Johnson to see if DRS would refer him to physical therapy. *Id.*

On February 5, 2010, Johnson was evaluated by Ashok Kache, M.D., who said that vocational rehabilitation could proceed. (R. 331-32).

Johnson was seen by a nurse practitioner at Morton Comprehensive Health Care (the "Morton Clinic") on August 30, 2011 with a chief complaint of back problems. (R. 413-15). On examination, Johnson had tenderness of his sacroiliac joints. (R. 414). He had reduced toe strength bilaterally and impaired heel and toe walking. *Id.* The assessment was low back pain, and medications were prescribed. (R. 414-15). Johnson saw the nurse practitioner again on September 8, 2011, and Neurontin was prescribed. (R. 411-13). He was seen again September 15, October 3, October 4, and October 21, 2011. (R. 396-411).

Nonexamining agency consultant Walter W. Bell, M.D., completed a Physical Residual Functional Capacity Assessment on December 27, 2010. (R. 387-94). Dr. Bell indicated that Johnson could perform work at the "sedentary" exertional level. (R. 388). In the section for narrative comments, Dr. Bell noted Johnson's extensive back surgery. *Id.* He noted that Johnson had not followed up with recommended extensive physical therapy. *Id.* He said that Johnson continued to have gait difficulties. He found that between May 31, 2008 and the date last insured of December 31, 2008, Johnson would have been capable of sedentary work. *Id.* He said that there was no evidence of the use of assistive devices during the relevant time period. *Id.* He noted that Johnson was able to care for his activities of daily living independently. *Id.* For postural limitations, Dr. Bell said that Johnson could never climb ladders and could only occasionally climb stairs, balance, stoop, kneel, crouch, or crawl. (R. 389). Dr. Bell found no manipulative, visual, communicative, or environmental limitations. (R. 390-91).

**Procedural History**

Johnson filed his application for disability insurance benefits on September 15, 2010, asserting onset of disability on May 31, 2008. (R. 194-95). The application was denied initially and on reconsideration. (R. 116-20, 123-25). An administrative hearing was held before ALJ John W. Belcher on January 4, 2012. (R. 45-109). By decision dated April 13, 2012, the ALJ found that Johnson was not disabled during the relevant time period. (R. 32-40). On November 25, 2013, the Appeals Council denied further review. (R. 1-7). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of this appeal. 20 C.F.R. § 404.981.

**Social Security Law and Standard Of Review**

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental

impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[1] *See also Wall v. Astrue*, 561 F.3d 1048, 1052-53 (10th Cir. 2009) (detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Lax*, 489 F.3d at 1084 (citation and quotation omitted).

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

---

[1] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taJohnson into account his age, education, work experience, and RFC, can perform. *See Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Wall*, 561 F.3d at 1052 (quotations and citations omitted). Although the court will not reweigh the evidence, the court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Id.*

## Decision of the Administrative Law Judge

In his decision, the ALJ found that Johnson met insured status requirements through December 31, 2008. (R. 34). At Step One, the ALJ found that Johnson had not engaged in any substantial gainful activity in the relevant period between his alleged onset date of May 31, 2008 and his date last insured of December 31, 2008. *Id.* At Step Two, the ALJ found that Johnson had a severe impairment of degenerative disc disease. *Id.* At Step Three, the ALJ found that Johnson's impairments did not meet any Listing. (R. 35).

The ALJ found that Johnson had the RFC to perform the full range of work at the sedentary exertional level during the relevant period. *Id.* At Step Four, the ALJ determined that Johnson could not return to past relevant work. (R. 38). At Step Five, the ALJ found that there were a significant number of jobs in the national economy that Johnson could perform, taking into account his age, education, work experience, and RFC. (R. 39). Therefore, the ALJ found that Johnson was not disabled at any time from May 31, 2008, through December 31, 2008. *Id.*

## Review

Johnson makes three arguments in this proceeding. First, he argues that there was a violation of due process related to a supplemental security income application he made pursuant to Title XVI of the Social Security Act (the "SSI application"). Plaintiff's Opening Brief, Dkt. #13, pp. 3-6. Second, he states that the ALJ's credibility assessment was inadequate. *Id.*, pp. 7-

9. Third, he argues that the ALJ impermissibly used only portions of the testimony of the vocational expert (the "VE"). *Id.*, pp. 9-10. Regarding the issues raised by Johnson, the Court finds that the ALJ's decision is supported by substantial evidence and complies with legal requirements. Thus, the ALJ's decision is **AFFIRMED**.

**Due Process Issues**

Social security hearings are subject to procedural due process considerations. *Yount v. Barnhart* , 416 F.3d 1233, 1235 (10th Cir. 2005); *Allison v. Heckler,* 711 F.2d 145, 147 (10th Cir.1983) (citing *Richardson v. Perales,* 402 U.S. 389, 401-02, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)). Johnson initially states his due process argument as follows: "[T]he ALJ failed to keep his promise and award Title XVI benefits on an application which was filed and was to be escalated to the ALJ level and the entire record is not included before this Court." Plaintiff's Opening Brief, Dkt. #13, p. 3.

The Court agrees with the Commissioner that there was no promise to award Title XVI benefits. The case decided by the ALJ was a Title II case only. (R. 32-40). The transcript of the hearing shows extensive discussion between Johnson's counsel and the ALJ. Johnson's attorney said that due to recent changes in his living arrangements, Johnson now qualified for Title XVI benefits, and the attorney said that he needed to file an SSI application and have it escalated to the ALJ. (R. 93). He asked for 30 days to do that. *Id.* Later, the ALJ said that Johnson might want to consider a later onset date for an SSI application because he would grid out at the sedentary level. (R. 101-02). The ALJ then stated that the attorney should discuss with Johnson adjusting the onset date, and he said that if Johnson agreed to that then the attorney would "need to get that elevated to me, I would approve it at age 50." (R. 102-03). He said if Johnson did not want to, they would proceed. (R. 103). After an off-the-record break, Johnson's attorney said

11

that Johnson did not want to abandon his Title II claim. (R. 103). Right before conclusion of the hearing, the ALJ said that he would give Johnson 30 days to develop the record and get the SSI application filed and elevated to him. (R. 108). Thus, the only agreement that is clear from the transcript of the hearing was that the ALJ would give 30 days for a new SSI application to be filed and escalated to him.

Johnson attached five exhibits to his Opening Brief, one of which showed that an SSI application was filed January 12, 2012 and was denied January 19, 2012. Plaintiff's Opening Brief, Dkt. #14-1. A Request for Reconsideration was filed apparently January 30, 2012. *Id.*, Dkt. #14-2.

The ALJ then issued his unfavorable decision on April 13, 2012, well after the 30-day period he had agreed to give Johnson to file the application and to get it escalated to the ALJ. (R. 32-40). Other exhibits filed by Johnson reflect considerable effort by his attorney's office to get the SSI application before the Appeals Council. Plaintiff's Opening Brief, Dkt. #14-4, #14-5. The Appeals Council explicitly addressed this in the denial of Johnson's request for review of the ALJ's decision. (R. 1-7). The Appeals Council stated that the issue of disability under Title XVI had not been before the ALJ and was not before the Appeals Council. (R. 2). The Appeals Council acknowledged the difficulty that Johnson had in attempting to obtain the status of the SSI application. *Id.* The denial stated that there was no record of the request for reconsideration and that therefore reconsideration was the next administrative remedy available to Johnson. *Id.*

The Court agrees with the Commissioner that this Court lacks jurisdiction to hear Johnson's claim as it relates to his SSI application because there is no final decision as to that application. 42 U.S.C. § 405(g). Johnson has clearly failed to exhaust his administrative remedies with respect to the SSI application. *Gibbs v. Colvin*, 529 Fed. Appx. 950, 953 (10th

Cir. 2013) (unpublished). In *Ingmire v. Astrue*, 359 Fed. Appx. 38, 40 (10th Cir. 2009) (unpublished), the claimant appealed denial of a Title II claim, but he had also made an SSI application that had been denied. The Tenth Circuit said that, to the extent claimant was challenging denial of the SSI claim, judicial review was precluded by his failure to exhaust administrative remedies. *Id.* The court also said that the claimant had failed to show that exhaustion was not required using the three-part test. *Id., citing Marshall v. Shalala*, 5 F.3d 453, 455 (10th Cir. 1993). The three-part test is that exhaustion would be futile; the claimant has suffered irreparable harm; and the claimant states a colorable constitutional claim. *Marshall* at 455. Here, Johnson has not asserted that his situation meets the requirements of this three-part test, and the Court finds that his appeal of his SSI application fails for failure to exhaust his administrative remedies.

Johnson at length complains that he did file a request for reconsideration and that therefore the Appeals Council statement to the contrary is false. He complains that the request for reconsideration was lost. He complains that the ALJ did not mention the SSI application in his decision. None of these complaints involves a final decision that would give this Court jurisdiction. Because there was no final decision regarding the SSI application and because Johnson did not exhaust his administrative remedies with respect to the SSI application, this Court has no jurisdiction with respect to the SSI application.

**Credibility Assessment**

Credibility determinations by the trier of fact are given great deference. *Hamilton v. Secretary of Health & Human Services,* 961 F.2d 1495, 1499 (10th Cir. 1992).

> The ALJ enjoys an institutional advantage in making [credibility determinations]. Not only does an ALJ see far more social security cases than do appellate judges, [the ALJ] is uniquely able to observe the demeanor and gauge the physical abilities of the claimant in a direct and unmediated fashion.

*White v. Barnhart,* 287 F.3d 903, 910 (10th Cir. 2002). In evaluating credibility, an ALJ must give specific reasons that are closely linked to substantial evidence. *See Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995); Social Security Ruling 96-7p, 1996 WL 374186. "[C]ommon sense, not technical perfection, is [the] guide" of a reviewing court. *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1167 (10th Cir. 2012).

The Court is convinced that the ALJ's credibility findings here are "closely enough linked to the evidence to pass muster." *Keyes-Zachary*, 695 F.3d at 1172. After an introductory paragraph stating that he found claimant's statements not credible to the extent that they were inconsistent with his RFC determination, the ALJ discussed the treating medical evidence in some detail. (R. 36-38).

The ALJ then started a paragraph by stating that Johnson "was not compliant with Dr. Milo most of the time." (R. 38). While the ALJ did not expressly state that the purpose of this paragraph was to address Johnson's credibility, the Court finds that the ALJ's reasoning is clear that he found these facts to undermine Johnson's claim of disability. A claimant's lack of compliance with treatment is a legitimate factor in finding that the claimant's claim of disability is not credible. *See* SSR 96-7p, 1996 WL 374186 *7 (observing that a claimant's credibility may be undermined "if the medical reports or records show that the individual is not following the

14

treatment as prescribed and there are no good reasons for this failure"); *Decker v. Chater*, 86 F.3d 953, 955 (10th Cir. 1996) ("The fact that [claimant] regularly exceeded the work restrictions recommended by his doctors was relevant to the credibility of his testimony concerning disabling pain."); *Sims v. Apfel*, 172 F.3d 879 *3 (10th Cir. 1999) (unpublished) (failure to follow doctors' instructions was a factor in determining credibility); *Williams v. Barnhart*, 178 Fed. Appx. 785, 788-89 (10th Cir. 2006) (unpublished) (failure to follow recommended medical advice listed as one of the ALJ's legitimate credibility findings).

As part of his paragraph addressing compliance, the ALJ said that Johnson did not walk or use the treadmill as requested by Dr. Milo. (R. 38). This legitimate factor was supported by substantial evidence, including Dr. Milo's June 16, 2008 note, approximately six weeks after the surgery, that Johnson preferred to play on his computer rather than to walk. (R. 370). On July 14, 2008, Dr. Milo again stated that Johnson needed to increase his activity level. *Id.* On September 8, 2008, Dr. Milo wrote that Johnson had quit using his treadmill even though he had been strongly urged to use it daily. (R. 314). On December 15, 2008, Dr. Milo again said that Johnson should increase his walking on the treadmill. (R. 436). All of these entries show that Johnson did not follow Dr. Milo's recommendations; therefore, this failure undermined his claim that his issues were disabling during the relevant period.

The other portions of this paragraph of the ALJ's decision are not clearly supported by substantial evidence. For example, the ALJ said that Johnson "did not follow up with the physical therapy." (R. 38). The evidence on this point is mixed, because it seems clear that at least some of the delays in physical therapy were on the part of DRS. Also, the ALJ appears to fault Johnson for the delay between his first 2006 appointment with Dr. Milo and his surgery after his second 2008 appointment. (R. 38). On this point, Johnson testified that he had tried

other treatments, such as chiropractic care, in the interval and that he returned to Dr. Milo after those treatments did not improve his condition. (R. 86-87). He also testified that some of the delay was on the part of DRS. *Id.* Under these circumstances, the undersigned finds that Johnson's delay from 2006 to 2008 was excused, and therefore this was not a point supporting the ALJ's adverse credibility finding.

The ALJ did have other supported credibility factors for his adverse assessment, however. In a later paragraph of his decision, the ALJ stated that the relevant period was May 31, 2008 through December 31, 2008. (R. 38). He said that during the relevant period, there was no evidence of use of assistive devices. *Id.* While Johnson testified that he had used a cane during this period, the initial evaluation by his physical therapist dated October 22, 2008 indicates that there were no assistive devices being used. (R. 74, 323). The undersigned has seen no medical notes in the administrative transcript that indicate that Johnson was using a cane during the relevant time period. The lack of use of assistive devices during the relevant time period is another factor supporting the ALJ's adverse credibility assessment.

The ALJ also stated that Johnson had been able to take care of his activities of daily living during the relevant time period. (R. 38). Johnson's physical therapist in the initial evaluation dated October 22, 2008 assessed grooming, dressing, home management, and transfers as four activities of daily living that Johnson could do on a "modified independent" basis. (R. 323). During his testimony, Johnson did not describe an inability to do activities of daily living independently, although he used modification strategies such as using the shopping cart for balance while shopping. (R. 50-89). Johnson's ability to manage his activities of daily living independently during the relevant period is another factor supporting the ALJ's adverse credibility assessment. *Hendron v. Colvin*, 767 F.3d 951, 956 (10th Cir. 2014) (ALJ properly

16

considered the claimant's activities during the relevant time period as part of his credibility assessment); *Newbold v. Colvin*, 718 F.3d 1257, 1267 (10th Cir. 2013).

In his brief, Johnson first asserts that the ALJ was in error in using the problems with physical therapy as an adverse factor detracting from Johnson's credibility because Johnson could not pay for the physical therapy and because the delays were caused by DRS. Plaintiff's Opening Brief, Dkt. #13, pp. 7-8. The Court, as discussed above, agrees that the evidence regarding the problems with physical therapy was mixed and therefore this factor was not supported by substantial evidence. However, this error by the ALJ does not mean that his credibility assessment is fatally flawed, because the ALJ gave other legitimate reasons that were supported by substantial evidence. *Keyes-Zachary*, 695 F.3d at 1168-69 (error "could not have had a substantial effect on the ALJ's assessment of the credibility of her complaint of disabling pain"); *Butler v. Astrue*, 410 Fed. Appx. 137, 139 (10th Cir. 2011) (unpublished) (court agreed one of ALJ's reasons was not clear, but other reasons for adverse credibility finding were sufficient).

Johnson then states that the medical evidence supported Johnson's claims of disability and he also briefly asserts that he met Listing 1.02A and Listing 1.04A.[2] Plaintiff's Opening Brief, Dkt. #13, pp. 8-9. These points do not affect the ALJ's credibility assessment because the factors cited by the ALJ remain supported by substantial evidence. The question the Court must decide is whether the decision of the ALJ is supported by substantial evidence.

---

[2] Johnson's allusion to the two Listings was in one sentence, without any development other than stating that Johnson met a Listing. Plaintiff's Opening Brief, Dkt. #13, pp. 8-9. This point is not sufficiently developed for this Court to be able to give it meaningful review, and it is therefore waived. *Wall*, 561 F.3d at 1066. *See also Sullivan v. Colvin*, 519 Fed. Appx. 985, 987 (10th Cir. 2013) (unpublished) (affirming lower court's finding of waiver on credibility issue).

> The possibility of drawing two inconsistent conclusions from the evidence does
> not prevent an administrative agency's findings from being supported by
> substantial evidence. We may not displace the agency's choice between two fairly
> conflicting views, even though the court would justifiably have made a different
> choice had the matter been before it de novo.

*Cowan v. Astrue*, 552 F.3d 1182, 1185 (10th Cir. 2008) (further quotation omitted). Here, even if the evidence was susceptible to a conclusion in favor of finding Johnson to be disabled, that possibility would not mean that the ALJ's conclusion of nondisability is lacking support by substantial evidence.

The credibility assessment of the ALJ complied with legal requirements and was supported by substantial evidence.

**The Testimony of the Vocational Expert**

At Step Five, the burden shifts to the Commissioner to show that there are jobs in significant numbers that the claimant can perform taking into account his age, education, work experience and RFC. *Haddock v. Apfel*, 196 F.3d 1084, 1088-89 (10th Cir. 1999). The ALJ is allowed to do this through the testimony of a VE. *Id.* at 1089. "Testimony elicited by hypothetical questions that do not relate with precision all of a claimant's impairments cannot constitute substantial evidence to support the [ALJ's] decision." *Hargis v. Sullivan*, 945 F.2d 1482, 1492 (10th Cir. 1991) (quotation omitted).

Johnson asserts that the ALJ erred by accepting part of the VE's testimony and rejecting part of it. Plaintiff's Opening Brief, Dkt. #13, pp. 9-10. The Court agrees with the Commissioner that the ALJ accepted the testimony of the VE in response to his hypothetical based on the RFC determination he ultimately made. (R. 97-99). The testimony of which Johnson complains is testimony in response to the ALJ's question asking whether there would be jobs available based on Johnson's testimony. (R. 99-100).

The ALJ made a supported finding that Johnson was not entirely credible, and therefore he was not required to accept the testimony of the VE that was premised on the credibility of Johnson's testimony. *See Talley v. Sullivan*, 908 F.2d 585, 588 (10th Cir. 1990); *Barrett v. Astrue*, 340 Fed. Appx. 481, 488 (10th Cir. 2009) (unpublished) (testimony of VE regarding limitations that were not ultimately included in the ALJ's RFC was not relevant); *Brescia v. Astrue*, 287 Fed. Appx. 626, 631 (10th Cir. 2008) (unpublished) (ALJ was not required to accept the VE's opinion regarding availability of jobs to a person required to lie down for several hours each day, as he concluded that this limitation did not exist).

The testimony of the VE supported the ALJ's decision at Step Five, and therefore the ALJ's decision is affirmed.

## Conclusion

The decision of the Commissioner is supported by substantial evidence and complies with legal requirements. The decision is **AFFIRMED**.

Dated this 11th day of March 2015.

_____
Paul J. Cleary
United States Magistrate Judge